**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.  25-cv-

GARVANS LORQUET,

     Plaintiff,

v.

OFFICER BRIAN LONG, a Denver Police Officer, in his individual capacity, and
CORPORAL AARON BOTTS, a Denver Police Corporal, in his individual capacity,

     Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Comes now the Plaintiff, Garvans Lorquet, by and through his attorney Sarah Schielke of

THE LIFE & LIBERTY LAW OFFICE, LLC, with this Complaint and Jury Demand, and in support of

the same, respectfully submits as follows:

## I.   INTRODUCTION

1. This is a civil rights lawsuit involving the unlawful arrest of Garvans Lorquet, who was arrested by the Defendant Denver Police Officers for driving under the influence despite having no drugs or alcohol in his system and showing no signs of impairment through the entirety of their encounter.

2. Plaintiff is a Black Haitian American. On October 13, 2023, he and his girlfriend were rear-ended by a drunk driver while they sat stopped at a red light. The drunk driver tried to convince them not to report the collision to police. Plaintiff refused and called police to the scene personally, as required by law. Defendant Denver Police Officer Brian Long responded to the scene and unreasonably profiled Mr. Lorquet based on his racial characteristics and ultimately detained and

1

arrested Mr. Lorquet for a DUI crime that he knew Mr. Lorquet did not commit. He and Defendant Corporal Botts grossly misrepresented and falsified indicators of impairment in their reports.

3. Plaintiff brings this civil rights action pursuant to § 13-21-131, C.R.S. and 42 U.S.C. § 1983 and 1988 for various forms of relief, to include compensatory damages and attorney's fees, stemming from Defendants' violations of Plaintiff's rights guaranteed by the Fourth and Fourteenth Amendments to the Constitution of the United States and Article II, Section 7 of the Colorado Constitution.

4. The Court has jurisdiction over Plaintiff's claims pursuant to § 28 U.S.C. 1331 and 1343(a)(3).

5. Jurisdiction supporting Plaintiff's claim for attorney's fees is conferred by 42 U.S.C. § 1988 and § 13-21-131(3).

6. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado or were directed at individuals within the State of Colorado.

## II. PARTIES

7. Plaintiff Garvans Lorquet is, and at all times relevant to this Complaint has been, a resident of the State of Colorado. He currently resides in Denver, Colorado.

8. Defendant Corporal Aaron Botts was at all times relevant to this Complaint duly appointed and sworn as a police officer working for the Denver Police Department. Corporal Botts is a named Defendant in his individual capacity.

9. Defendant Officer Brian Long was at all times relevant to this complaint duly appointed and sworn as a police officer working for the Denver Police Department. Officer Long is a named Defendant in his individual Capacity.

## IV.  STATEMENT OF FACTS

10. On the evening of October 13, 2023, Plaintiff Garvans Lorquet and his then-girlfriend, Joycelin Appiah, were at home watching a movie and drinking hot chocolate.

11. When the movie ended, they decided to take a drive around downtown Denver to explore their new neighborhood and people-watch the Friday night scene.

12. Several days prior, on October 8, 2023, Plaintiff and Joycelin were in a car accident that totaled their car and caused them to suffer several injuries. Their auto insurance company had supplied them with a rental car to use for transportation while the rest of their claim was processed.

13. Plaintiff was still feeling sore from the accident, so he had his girlfriend drive for their evening lap around the neighborhood.

14. Plaintiff was also tired. He worked as a locker room attendant at Denver Athletic Club and had his next shift starting the following morning at 4:00 am.

15. At approximately 8:00 pm, just a couple of minutes into their drive, Plaintiff and his girlfriend were sitting stopped at a red light on the 1400 block of Market Street when they suddenly felt a jolt from behind and were thrust forward. Their vehicle had been rear-ended by a woman later identified as Shauntel Willie.

16. Shauntel Willie was driving a car that did not belong to her and without insurance. She was also intoxicated.

17. After the impact from Ms. Willie, both vehicles pulled into the adjacent parking lot at 1401 Wazee Street.

18. Ms. Willie jumped out of her car and immediately began insisting there was "like no" damage to the vehicles and that they should not call the police to make an accident report (in violation of Colorado law).

19. Plaintiff, recently traumatized by his own serious car accident and wishing to follow the law, rightfully demanded they call the police and exchange insurance and contact information.

3

20. Ms. Willie became heated and continued to argue with Plaintiff, insisting that calling the police was unnecessary. She even attempted to bribe Plaintiff with cash. When that didn't work, she next threatened to call her friend, who she claimed was a police officer. When Plaintiff asked for the police officer friend's name and badge number, Ms. Willie refused to provide it, stating that it was none of his business.

21. Fed up, Joycelin told Plaintiff to just sit in the truck and call the police while she stayed outside and monitored Ms. Willie to ensure she remained at the scene while waiting for police to arrive.

22. It was quite cold out (34 degrees) and neither Joycelin nor Plaintiff had dressed to be out in that type of weather. Their plan to take an evening drive around their new neighborhood that night had naturally not included getting out of the car for any measurable period of time.

23. As a result, while waiting for Denver Police to arrive, Joycelin and Plaintiff took turns standing in the cold by Ms. Willie to ensure she remained on scene and sitting back in their car to try and warm up.

24. Around 8:30 pm, various law enforcement personnel finally arrived from the Denver Police Department.

25. When they saw the Denver Police vehicles arriving with their red and blue lights on, Joycelin and Plaintiff left guard duty of Ms. Willie and both returned to the truck. Plaintiff got in the driver's seat and Joycelin the passenger's seat.

26. It should be noted that considerable portions of bodyworn camera ("BWC") video are missing in this case. In fact, there are points in Defendant Long's BWC video where another officer can be seen speaking with either Plaintiff or Joycelin, yet none of the mandatory BWC footage of these interactions was ever provided to Plaintiff in his criminal case. Despite there being at least 3 police cruisers and 5 officers on scene at this accident, only short clips of Defendant Long's BWC video were provided.

4

27. C.R.S. §24-31-902(1)(a)(II)(A) provides that, "a peace officer shall wear and activate a body-worn camera or dash camera,…when responding to a call for service,…or during any interaction with the public initiated by the peace officer, whether consensual or nonconsensual, for the purpose of enforcing the law or investigating possible violations of the law."

28. C.R.S. §24-31-902(1)(a)(III) further provides that, "If a peace officer fails to activate a body-worn camera or dash camera as required by this section or tampers with body-worn- or dash-camera footage or operation when required to activate the camera, there is a permissive inference in any investigation or legal proceeding…that the missing footage would have reflected misconduct by the peace officer."

29. Upon information, belief, and the inferences directed by § 24-31-902(1)(a)(III), the missing BWC footage in this case would reflect misconduct by the officers on scene.

30. Defendant Officer Brian Long was first to talk to Plaintiff, and he asked: "Were you involved in the accident?" Plaintiff responded, "Yes."

31. Defendant Long then asked if Plaintiff or Joycelin needed an ambulance, to which Plaintiff declined and stated he only wanted a police report for the accident to ensure he had the proper documentation for his insurance company.

32. Plaintiff explained to Defendant Long that he had been in a serious accident just recently and that he was in "a lot of pain, my neck, my lower back" but that he did not want to have to return to the hospital again if he didn't have to.

33. Defendant Long then asked Plaintiff for his driver's license.

34. Plaintiff had left his wallet at home, so he pulled up the MyColorado app on his phone and showed Defendant Long his driver's license that way. Defendant Long confirmed the license's authenticity on the app.

35. Plaintiff also provided Defendant Long with proof of insurance from his phone.

36. Plaintiff did all of these complex tasks promptly, normally, and without indication of impairment, even to the slightest degree.

37. Defendant Long then asked where the other driver and vehicle were located, and Plaintiff pointed to Ms. Willie and the Ford Explorer she was driving.

38. It appears from the limited BWC video provided that Defendant Long went over and talked to the intoxicated Ms. Willie and despite her obvious impairment indicia, he asked her no questions whatsoever about alcohol or drug consumption while interviewing her.

39. Ms. Willie appears to be white.

40. Ms. Willie was eventually arrested on scene for DUI and failing to provide proof of insurance by the other Denver PD officers. She later pleaded guilty to the DUI as her second DUI offense within 5 years.

41. It should be noted that there is no footage from any of the on-scene officers' BWC for nearly twenty minutes while those other officers investigated and then ultimately arrested Ms. Willie.

42. After waiting around for 20 minutes, Plaintiff approached Officer Long who was standing near the police vehicles with another officer, talking. Plaintiff wanted to go home. He asked: "You guys need anything else from us, or?" and Defendant Long responded, "Uh yeah, just need one thing from you real quick."

43. It should be noted that the red and blue lights on each of the police vehicles parked directly behind Plaintiff's rental truck were all still activated, indicating a seizure from which Plaintiff was not free to leave.

44. Plaintiff can also be seen in the BWC surrounded by two to three officers at all times whenever he was outside of his vehicle.

45. The officer standing next to Defendant Long (who is not mentioned in the police report, did not write his own report, and did not provide his BWC videos) told Plaintiff that they had arrested Ms. Willie and that she had been unable to provide proof of insurance for the vehicle.

46. Defendant Long then told Plaintiff to "come over here, flashing lights and everything," and gestured at Plaintiff to follow him deeper into the parking lot.

47. Defendant Long then told Plaintiff he had "some concerns with your speech and your blood shot watery eyes."

48. On Defendant Long's BWC video, Plaintiff's eyes do not appear bloodshot or watery at all. That's because they were not bloodshot or watery.

49. Defendant Long would later characterize Plaintiff's speech in his police report as "Thick-Tongued."

50. In the BWC video, Plaintiff was not mumbling, slurring, or anything else that could be characterized as "thick-tongued."

51. The only possible explanation for Defendant's claim that Mr. Lorquet's speech was "thick-tongued" and indicative of impairment is racial bias. It has been shown in numerous studies that "thick-tongued speech" is a racially biased construct that refers to linguistic patterns associated with minority groups, particularly Black individuals.

52. In other words, Defendant Long saw that Plaintiff was Black and then (desperate to identify anything in the very sober Plaintiff that he could possibly claim to be evidence of drug/alcohol impairment) he discriminated against Plaintiff for "sounding Black" by claiming that his speech was "thick-tongued" and thus indicative of impairment.

53. Defendant Corporal Botts would later join Defendant Long in discriminating against Plaintiff Mr. Lorquet based on his race by putting in his probable cause affidavit the claim that Mr. Lorquet's "SPEECH WAS THICK AND DISTINCT" as "indicia of impairment."

54. To reiterate, Plaintiff's speech was *not* "thick and distinct" (nor "thick-tongued"); however, this did not stop either Defendant from seeing Mr. Lorquet's race and then ascribing racist stereotypes to his speech with the hope that doing so would assist in justifying their wrongful and discriminatory DUI arrest.

55. Defendant Long then asked Plaintiff, "how much alcohol have you had to drink tonight?"

56. Plaintiff responded with no hesitation: "Zero."

57. Defendant Long replied, "Perfect!"

58. Then, instead of ceasing his detention of Plaintiff and Joycelin and sending them on their way, Defendant Long decided he would show off for all the other DPD officers hanging around by forcing Plaintiff through a bunch of roadside tests and arresting him for DUI.

59. So, with no indicia of impairment and all indicia of sobriety observed from Plaintiff, and therefore with no reasonable suspicion of DUI whatsoever, Officer Long extended his seizure of Plaintiff into an intrusive and embarrassing DUI investigation.

60. **It bears reiterating that both Defendant Long and Defendant Botts were aware that Mr. Lorquet *had not driven any vehicle that evening* when they effected his wrongful DUI arrest and subsequent criminal prosecution for DUI**. Defendant Corporal Botts even put in his police report: "[Lorquet] was not the driver of the non-at-fault vehicle but got into the driver's seat with the engine running upon police contact."

61. Knowing this, and also knowing that Plaintiff had in over 30+ minutes of interaction exhibited zero indications of impairment, Defendant Long next ordered Plaintiff to "come over here" to do "some roadside maneuvers to make sure you're cool to drive."

62. Confused, but outnumbered and surrounded by uniformed/armed police officers and not wanting to escalate tensions between himself and all those officers on scene, Plaintiff complied.

63. Defendant Long directed Plaintiff into the dark parking lot, away from the well-lit street, and began interrogating Plaintiff.

64. There, Defendant Long first attempted to get Plaintiff Mr. Lorquet to admit to consuming any prescription drug that might help Long later justify the baseless DUI arrest he intended to make.

65. Defendant Long was not successful in obtaining from Plaintiff any such admission to consuming prescription drugs.

66. Plaintiff did explain he had "a stiff neck and lower back pain" from the previous car accident and had been prescribed a transdermal patch (Lidocaine) to put on his body. Defendant Officer Long responded, "oh, perfect, did you take a dose of that today?" and Plaintiff replied: "No, no."

67. Defendant Long tried more than once to get Plaintiff to admit to using the Lidocaine patch he was prescribed that day (bizarrely, as Lidocaine is not an impairing medication), and Plaintiff, each time without confusion or hesitation, told him he had not used a patch (or any medication) that day.

68. Undeterred, Defendant Long decided he would continue his unlawful detention of Mr. Lorquet, make him do roadside maneuvers, and regardless of how he performed, arrest him for DUI.

69. Defendant Long first purported to administer the HGN (Horizontal Gaze Nystagmus) test to Mr. Lorquet. He administered it incorrectly. Later, he would falsely claim in his police report that both of Mr. Lorquet's eyes exhibited a lack of smooth pursuit (or "two clues" of alcohol impairment) during the test. This was not true. Long's BWC video reveals that both Mr. Lorquet's eyes exhibited smooth pursuit during the purported HGN test, despite Long administering it incorrectly.

70. Mr. Lorquet's eyes in fact exhibited zero "clues" of impairment related to alcohol or drugs on the purported HGN test.

71. Throughout the purported roadside tests, Mr. Lorquet had stable, perfect balance.

72. Defendant Long next purported to administer the Walk & Turn maneuver.

73. Defendant Long also administered the maneuver incorrectly.

74. Despite the Walk & Turn being administered incorrectly, Plaintiff still exhibited no indicia of drug or alcohol impairment.

75. Defendant Long next purported to administer the One Leg Stand (OLS) maneuver.

76. Defendant Long also administered this maneuver incorrectly.

77. Despite the One-Legged Stand being administered incorrectly, Plaintiff still exhibited no indicia of drug or alcohol impairment.

78. Defendant Long next purported to administer the Modified Romberg test. This "test" has not scientifically validated to detect anything related to drug or alcohol impairment. Despite this reality, Defendant Long still failed to administer the MR "test" in the manner trained by NHTSA.

79. Despite the MR "test" being administered incorrectly, Plaintiff still exhibit no indicia of drug or alcohol impairment.

80. Later, Defendants Long and Botts would lie in their reports and claim that Plaintiff's eyelids "fluttered" during the Modified Rhomberg. Eyelid fluttering is actually considered normal during the Modified Rhomberg. Regardless, Long's BWC video reveals that Mr. Lorquet's eyelids did not flutter at all during this "test."

81. Upon information and belief, despite claiming in his police report that "Upon contact, [Lorquet] exhibited the listed indicia of impairment: SPEECH WAS THICK AND DISTINCT, BALANCE WAS UNSTEADY, AND EYES WERE RED/WATERY," and despite *admitting* in his police report that "[Lorquet] was not the driver of the non-at-fault vehicle," Defendant Botts was not on scene at the accident and made no such observations on scene of Mr. Lorquet.

82. The Defendants' utterly sloppy effort to just invent random observations of indicia of drug/alcohol impairment in their police reports is further revealed by the fact that Defendant Long (who purported to conduct the roadside tests) admitted in his report that Plaintiff's balance was "sure" (as opposed to swaying/staggering/stumbling/falling/unsteady or anything else) while Defendant Corporal Botts – who apparently never even interacted with Mr. Lorquet on scene – claimed in his report that Mr. Lorquet's balance was "unsteady."

83. At the completion of the Modified Romberg test, Defendant Long immediately placed Plaintiff under arrest for "driving while impaired."

84. Shocked and more importantly **quite sober**, Plaintiff exclaimed, "Impaired? What do you mean impaired??"

85. Defendant Long ignored this question and next purported to invoke Colorado's Express Consent law and told Plaintiff: "You're required by law to consent to a test of your blood when you are driving impaired. Are you going to cooperate with the blood test sir?"

86. Defendant Long did not give Plaintiff a choice of breath or blood because he wanted to go on a fishing expedition and cast his net as wide as possible to justify the arrest while knowing he did not have probable cause to arrest.

87. Initially, due to his state of shock and his fear of needles, Plaintiff stated, "No, I'm not going to, because I'm not impaired."

88. Plaintiff told Defendant Long "I'm going to sue the fuck out of you guys! I didn't do anything, I am tired and cold!" He then shouted out to Joycelyn for help.

89. Plaintiff continued to exclaim his innocence, stating "Dude you guys are arresting the wrong person! How the heck am I- ?? What did I do? What did I do? I am tired! I am cold!"

90. Defendant Long didn't care. He put Plaintiff into a patrol car, and went back over to Joycelin in the truck. His BWC video abruptly ends in the middle of talking with Joycelin and figuring out the proper disposition of Plaintiff's truck.

91. Twelve minutes later, Long's next BWC video provided picks back up. It is unclear what happened on scene in that twelve minutes, what conversations were had between the officers, Joycelin, Plaintiff or anyone else on scene. The fact that this footage is missing creates a permissive inference of misconduct pursuant to C.R.S. §24-31-902(1)(a)(III).

92. This BWC begins with Defendant Long and another officer talking about Defendant Corporal Aaron Botts, with the one officer stating: "Alright, and Aaron knows you did the roadsides and stuff there?" and Long replying "Yep, so he– I'll be sending everything to him, so don't worry about it."

93. Defendant Corporal Aaron Botts is a Drug Recognition Expert and an instructor in SFSTs, Intoxilyzer 9000, and DRE.

11

94. According to the Colorado Department of Transportation (CDOT), a Drug Recognition Expert is a law enforcement officer trained to recognize impairment in drivers under the influence of drugs other than, or in addition to, alcohol.

95. According to Brittany James, the DRE program manager at CDOT, DREs conduct additional testing and evaluation after the arrest "to really nail down what impairing substances the driver is on."

96. Defendant Botts has won several awards for his DUI enforcement, including: Denver Police Department's Officer of the Year Award in March of 2024, the Col. Mark V. Trostel Enforcement Officer of the Year Award at the 2022 Colorado Department of Transportation and Mothers Against Drunk Driving Law Enforcement Champion Awards, and MADD's DUI Enforcement Hero in 2021.

97. Defendant Botts regularly attends MADD galas, and assists the City of Denver and Denver Police Department with all things DUI. At a meeting with Denver City Counsel, he pitched the idea of creating podcast episodes to address impaired driving enforcement. The board approved the idea.

98. Defendant Botts travels the country teaching other law enforcement agencies his tips and tricks to making DUI arrests and using confirmation bias to assess impairment.

99. Defendant Botts also nationally teaches a course called, "Making the Call: Enhancing DRE Investigations."

100.    Defendant Botts apparently believes it is illegal to have one beer and drive. He speaks publicly about this and presumably teaches this false statement of the law.

101.    Defendant Long then approached Joycelin again, who was understandably frustrated at this point.

102.    Apparently attempting to lure yet another person of color (Joycelyn is also Black) into a wrongful DUI arrest, Defendant Long can next be seen ordering Joycelin out of the car to come

talk with him on the sidewalk. Joycelin responded: "I'm on the phone, so one second. I've done nothing wrong so what do you guys need to talk to me for?"

103. Defendant Long then lied (again) and abruptly told Joycelin *she* **was at fault for the accident**. Joycelin inquired, "how am I at fault?" Defendant Long refused to tell her how she was at fault for a collision where she was rear-ended by a drunk driver while sitting stopped at a red light, and instead told her she would have to get out of the car and he would only speak to her on the sidewalk.

104. Joycelin had just witnessed Defendant Long's utterly baseless and racist arrest of Plaintiff Mr. Lorquet and was not willing to take the bait and be Long's next victim. "No, no, no," she replied. "How am I at fault for the accident? Explain that to me."

105. Defendant Long, caught in his lie, refused to answer her question.

106. Joycelin then told Defendant Long the same, consistent story she and Plaintiff had maintained from the 911 call. "I was the one driving…sir I have nothing to lose, what the hell do I have to lie about? I was at a red light going home with my boyfriend, he– the lady hit us!"

107. It would be unlawful for Joycelin to *not* be stopped at a red light. There is no way a vehicle lawfully stopped at a red light could possibly be at fault for being rear-ended by an intoxicated person driving without insurance. Defendant Long knew that, and he was simply trying get Joycelin to say anything that might help him justify his arrest of Mr. Lorquet (and possibly her as well).

108. Joycelin berated Defendant Long for arresting her plainly sober boyfriend. Long told her that Plaintiff was under arrest and that "wasn't changing." Then he gave up on trying to arrest Joycelin for DUI as well and abruptly turned off his BWC.

109. 25 minutes later, Defendant Long's BWC video picked back up at the jail.

110. Plaintiff had apparently changed his mind and told the officers he was willing to consent to a blood draw.

111. Long's next less-than-90-second video shows Defendant Long confirming with Plaintiff that he wants to do a blood draw, explaining what the blood draw entails, and Plaintiff confirming that

he wanted the blood drawn. Then Defendant Long and another officer can be seen putting the plainly sober and innocent Plaintiff back in handcuffs and beginning to walk him out of the jail.

112. This BWC video abruptly ends before they even left the hallway.

113. The next BWC video picks up at the hospital 10 minutes later. This time, the BWC is worn by Defendant Botts. It begins with Defendant Botts asking Defendant Long some basic questions about the arrest.

114. When Defendant Botts asked Long Plaintiff's name, Defendant Long stated, "that's a good question."  He did not even care to remember, let alone bother to ask Mr. Lorquet his name or how it was pronounced. Defendant Botts, at the very least, asked Plaintiff what his name was when he introduced himself.

115. Defendant Botts then told Plaintiff that he was with the DUI unit and that he would do the "processing part of this."

116. While the nurse asked Plaintiff questions, Plaintiff can be seen answering each question with perfect articulation and clarity.

117. In the well-lit hospital room, Plaintiff's eyes can also be seen clearly. They did not appear red or watery whatsoever.

118. Defendant Botts would go on to note in his arrest report – incomprehensibly – that Plaintiff's Degree of Impairment was "Obvious." Not only was this a lie, this was a lie rooted in racial bias. Plaintiff was obviously *unimpaired*. The first brief exchange Defendant Botts had with Plaintiff when he entered the hospital room lasted 10 seconds, where Plaintiff spoke two (clear) words to him. The second exchange was another 10 seconds. Plaintiff clearly, and with no "thick tongue" or "thick and distinct" speech, asked if he could see the results of his blood test, to which Defendant Botts told him it would take a few months and "it'll be at your court date when we get those results."

119. Defendant Botts never asked Plaintiff to cooperate with a DRE evaluation nor did he perform a DRE evaluation on Plaintiff.

14

120. The fact that Defendant Botts did not even *attempt* to do a DRE evaluation on Plaintiff is extremely telling. DREs must maintain a minimum quota of DRE evaluations conducted every two years in order to maintain their DRE certification. It is quite difficult to get individuals who have already been arrested for DUI-Drugs to consent to DRE exams, especially since they must also waive their *Miranda* rights in order to participate. DREs frequently drive for miles to get to a jail where someone arrested for DUI-Drugs has consented to have a DRE exam done on them. So the fact that Botts had a DUI-Drugs arrest dropped into his lap and he didn't even *ask* the person if he could do a DRE exam all but reveals his knowledge that Plaintiff was not impaired by any drug at all.

121. DREs must keep what is called a "Rolling Log" of their DRE exams that tracks every DRE exam they do, what category of drug they concluded the individual to be under the influence of, and – when the blood results come back – what drug, if any, was found.

122. Defendant Botts' choosing to not offer Plaintiff a DRE exam at all thus reveals his knowledge that Plaintiff would almost certainly have a "none detected" blood result, which he naturally did not want to have to record in his DRE Rolling Log.

123. After the blood draw, Defendant Long stood Plaintiff up to take him to the jail. As he did so, Long said, "We're just gonna go back to where you came from."

124. Plaintiff was never read his *Miranda* rights.

125. Defendant Long took Plaintiff back to the jail while Defendant Botts finished paperwork for Plaintiff's wrongful arrest, which (as already discussed *supra*) contained numerous false claims of observations of impairment.

126. Eventually, Defendant Botts returned to the jail where Plaintiff was still waiting.

127. Defendants Botts and Long then filled out their arrest paperwork together and exchanged ideas for what substance they could pretend they suspected Plaintiff to be under the influence of.

128.    Defendant Botts asked Long, "did you find anything on this guy?" (meaning "did you find any criminal record on him?") and when Defendant Long told him "no," Botts replied, in apparent disbelief due to his racial stereotypes, "Oh really?? You can't find nothing on him??"

129.    Plaintiff was booked into the Denver jail and kept overnight.

130.    Plaintiff was released on a PR bond the next morning around 9 am, long after he was due to clock in for his 4 am shift at Denver Athletic Club.

131.    Plaintiff was forced to miss work that day.

132.    Plaintiff suffered anxiety and depression in the months that followed, while also attempting to recover from his physical injuries from the first accident.

133.    Plaintiff had to wait on edge for months, worrying about the long-term consequences he may have to face for a crime he knew he did not commit.

134.    Plaintiff was forced to spend significant funds he did not have hiring a lawyer to defend him from the false charges in his criminal case.

135.    Plaintiff was even more apprehensive of law enforcement, scared at any moment he may be targeted once again for being a Black, Haitian American man who had the nerve to be in public.

136.    Plaintiff's blood results did not come back until January the following year.

137.    To no one's surprise, Plaintiff's blood test results showed "not detected" for all drugs and alcohol:

**Involved Subjects**

Suspect:    Garvans Denis Lorquet    DOB:    07/31/1998    SID:

| CBI Item #: | Agency Item #: | Description of Evidence: |
|---|---|---|
| Item 1 | CBI | TOX Collection Kit |
| Item 1.1 | | Gray top vial with blood |
| Item 1.2 | | Gray top vial with blood |

**Results/Opinions and Interpretations:**

Item 1.1

| Drug | Result | Method |
|---|---|---|
| Ethanol/Volatiles | Not Detected | HS-GC/FID |
| Drugs of Abuse Screen | Not Detected | ELISA |

138.    Two weeks later, on January 20, 2024, Deputy District Attorney, Beth McCann, filed a motion to dismiss the criminal case. Shortly thereafter, the court did dismiss Plaintiff's criminal case.

139. Even though his criminal case had been dismissed, Plaintiff's suffering did not end. Plaintiff continues to this day to suffer from anxiety, fear, emotional distress, humiliation, and anguish due to his wrongful arrest. He was already wary of law enforcement prior to this incident; however after the incident, he struggles to even feel safe at home or driving from point A to point B. He has near constant anxiety that he can be arrested and jailed at any moment, at the whim of any discriminatory police officer looking to make a quick DUI arrest to pad his DUI arrest stats. His fears are not misplaced. That is exactly what has happened to him already.

140. To this day, two years later, Plaintiff lives in constant fear that he will once again be targeted by police due to the color of his skin and ulterior DUI-accolades-based police motives.

## V. STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**42 U.S.C. § 1983, Fourth Amendment**
*Unlawful Seizure - Roadsides*
*(Against Defendant Long)*

141. Plaintiff incorporates by reference as though fully set forth herein each and every allegation contained in all other paragraphs of this Complaint.

142. The actions of Defendant Long, as described herein, while acting under color of state law, intentionally deprived Mr. Lorquet of the securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including his right to be free from unlawful seizure as guaranteed by the Fourth Amendment to the Constitution of the United States of America and 42 U.S.C. § 1983, in that Mr. Lorquet was detained without reasonable suspicion to believe he had committed any offense.

143. Defendant Officer Long did not have reasonable suspicion of any crime or offense justifying his traffic stop and extended detention of Mr. Lorquet for roadside tests.

17

144.    At no time did Defendant Officer Long develop reasonable suspicion or probable cause (nor arguable reasonable suspicion or arguable probable cause) of any crime or offense justifying his continued detention of Mr. Lorquet.

145.    When Plaintiff walked over to Defendant Long to ask if he was free to leave, there were at least three police cruisers with their red and blue lights activated and flashing, indicating a traffic stop in which Plaintiff was not free to leave. Then in fact Defendant Long told Plaintiff he was not free to leave.

146.    Defendant Long detained Plaintiff on scene when he had no further administrative reasons to keep him there, and he had no reasonable suspicion that Plaintiff had committed a crime.

147.    Plaintiff exhibited zero indicia of impairment at all times. He did not smell of alcohol or marijuana; he was not slurring his words; he was not unsteady on his feet; he spoke logically and intelligibly; his eyes did not show signs of impairment.

148.    Defendant Long didn't just know that Plaintiff was not at fault for the collision; Defendant Long knew that *Plaintiff had not even driven a vehicle* when he made him do roadside tests.

149.    Defendant Long therefore knew (and any reasonably trained officer would have known) that he did not have reasonable suspicion to detain Mr. Lorquet and to force him through purported roadside tests.

150.    The actions described herein of Defendant Long, while acting under color of state law, deprived Mr. Lorquet of the rights, privileges, liberties, and immunities secured by the Fourth Amendment to the Constitution of the United States of America. These deprivations caused Mr. Lorquet to suffer lost liberty, reputational injuries, economic losses, noneconomic pain and suffering, and all other damages that flowed therefrom.

18

## SECOND CLAIM FOR RELIEF
### C.R.S. §13-21-131, Colo. Con. Art. II, § 7
### *Unlawful Seizure - Roadsides*
### *(Against Defendant Long)*

151.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

152.    Section 13-21-131 of the Colorado Revised Statutes directs that any peace officer who "subjects or causes to be subjected, including failure to intervene, any other person to the deprivation of any individual rights … secured by the bill of rights, article II of the state constitution is liable to the injured party for legal or equitable relief or any other appropriate relief."

153.    Statutory immunities and statutory limitations on liability, damages, or attorneys fees do not apply to claims brought pursuant to § 13-21-131.

154.    Defendant Long was a peace officer under Colo. Rev. Stat. § 24-31-901(3), employed by the Denver Police Department (City and County of Denver) at the time he wrongfully seized Mr. Lorquet.

155.    Defendant Officer Long did not have reasonable suspicion of any crime or offense justifying his traffic stop and extended detention of Mr. Lorquet for roadside tests.

156.    At no time did Defendant Officer Long develop reasonable suspicion or probable cause (nor arguable reasonable suspicion or arguable probable cause) of any crime or offense justifying his continued detention of Mr. Lorquet.

157.    When Plaintiff walked over to Defendant Long to ask if he was free to leave, there were at least three police cruisers with their red and blue lights activated and flashing, indicating a traffic stop in which Plaintiff was not free to leave. Then in fact Defendant Long told Plaintiff he was not free to leave.

158.    Defendant Long detained Plaintiff on scene when he had no further administrative reasons to keep him there, and he had no reasonable suspicion that Plaintiff had committed a crime.

159.    Plaintiff exhibited zero indicia of impairment at all times. He did not smell of alcohol or marijuana; he was not slurring his words; he was not unsteady on his feet; he spoke logically and intelligibly; his eyes did not show signs of impairment.

160.    Defendant Long didn't just know that Plaintiff was not at fault for the collision; Defendant Long knew that *Plaintiff had not even driven a vehicle* when he made him do roadside tests.

161.    Defendant Long therefore knew (and any reasonably trained officer would have known) that he did not have reasonable suspicion to detain Mr. Lorquet and to force him through purported roadside tests.

162.    The actions described herein of Defendant Long, while acting under color of state law, deprived Mr. Lorquet of the rights, privileges, liberties, and immunities secured by the Fourth Amendment to the Constitution of the United States of America. These deprivations caused Mr. Lorquet to suffer lost liberty, reputational injuries, economic losses, noneconomic pain and suffering, and all other damages that flowed therefrom.

### THIRD CLAIM FOR RELIEF
**42 U.S.C. § 1983, Fourth Amendment**
*Unlawful Seizure – Wrongful Arrest*
*(Against Defendants Long and Botts)*

163.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

164.    The actions of Defendants Long and Botts, as described herein, while acting under color of state law, intentionally deprived Mr. Lorquet of the securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including his right to be free from unlawful seizure as guaranteed by the Fourth Amendment to the Constitution of the

20

United States of America and 42 U.S.C. § 1983, in that Mr. Lorquet was arrested without a warrant and without probable cause to believe he had committed any offense.

165. After unlawfully detaining Mr. Lorquet without reasonable suspicion to do roadside tests, Defendant Long, with Defendant Botts's assistance and personal participation, then wrongfully arrested Mr. Lorquet for DUI. Both knew there was no probable cause for this warrantless arrest.

166. Defendant Botts had highly specialized training specific to recognition of drug impairment and knew within minutes of encountering Mr. Lorquet that he was not impaired by any drug. Despite this knowledge, he assisted Defendant Long in wrongfully arresting and jailing Plaintiff.

167. When Defendant Botts took over "processing" at the hospital, he observed no signs of impairment.

168. Instead of performing (or even asking to perform) a DRE evaluation on Plaintiff, Defendant Botts opted to not attempt a DRE exam at all.

169. Any reasonably well-trained officer in Defendant Botts's shoes and Defendant Long's shoes would have known that Mr. Lorquet was not intoxicated or impaired by any substance.

170. The actions described herein of Defendants Long and Botts, while acting under color of state law, deprived Mr. Lorquet of the rights, privileges, liberties, and immunities secured by the Fourth Amendment to the Constitution of the United States of America and Article II, §7 of the Colorado Constitution. These deprivations caused Mr. Lorquet to suffer lost liberty, reputational injuries, economic loss, and all damages flowing therefrom.

**FOURTH CLAIM FOR RELIEF**
**Section 13-21-131, C.R.S. – Article II, § 7 of Colorado Constitution**
*Unlawful Seizure – Wrongful Arrest*
*(Against Defendants Long and Botts)*

171. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

172. Section 13-21-131 of the Colorado Revised Statutes directs that any peace officer who "subjects or causes to be subjected, including failure to intervene, any other person to the deprivation of any individual rights … secured by the bill of rights, article II of the state constitution is liable to the injured party for legal or equitable relief or any other appropriate relief."

173. Statutory immunities and statutory limitations on liability, damages, or attorneys fees do not apply to claims brought pursuant to § 13-21-131.

174. Defendants Long and Botts were police/peace officers under Colo. Rev. Stat. § 24-31-901(3), employed by the Denver Police Department at the time they wrongfully seized, arrested and maliciously prosecuted Mr. Lorquet.

175. After unlawfully detaining Mr. Lorquet without reasonable suspicion to do roadside tests, Defendant Long, with Defendant Botts's assistance and personal participation, then wrongfully arrested Mr. Lorquet for DUI. Both knew there was no probable cause for this warrantless arrest.

176. Defendant Botts had highly specialized training specific to recognition of drug impairment and knew within minutes of encountering Mr. Lorquet that he was not impaired by any drug. Despite this knowledge, he assisted Defendant Long in wrongfully arresting and jailing Plaintiff.

177. When Defendant Botts took over "processing" at the hospital, he (like Defendant Long) observed no signs of impairment in Mr. Lorquet whatsoever.

178. Instead of performing (or even asking to perform) a DRE evaluation on Plaintiff, Defendant Botts opted to not attempt a DRE exam at all. This is because he knew Plaintiff was not impaired by any substance whatsoever.

179. Any reasonably well-trained officer in Defendant Botts's shoes and Defendant Long's shoes would have known that Mr. Lorquet was not intoxicated or impaired by any substance whatsoever.

22

180.    The actions described herein of Defendants Long and Botts, while acting under color of state law, deprived Mr. Lorquet of the rights, privileges, liberties, and immunities secured by Article II, §7 of the Colorado Constitution. These deprivations caused Mr. Lorquet to suffer lost liberty, reputational injuries, economic loss, and all damages flowing therefrom.

**FIFTH AND SIXTH CLAIMS FOR RELIEF**
**42 U.S.C. § 1983, Fourth Amendment (Fifth)**
**C.R.S. § 13-21-131, Colo. Con. Art. II, § 7 (Sixth)**
*Malicious Prosecution*
*(Against All Defendants)*

181.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

182.    Defendant Long, with Defendant Botts direct assistance and personal participation, arrested, jailed, and maliciously prosecuted Mr. Lorquet for Driving Under the Influence without probable cause to do so.

183.    Defendants caused Mr. Lorquet's prosecution and confinement when they submitted materially false police reports asserting that Mr. Lorquet was driving under the influence of drugs or alcohol and listing claimed "indicia of impairment" that they knew were not present and that they had not observed.

184.    Prior to the arrest, Defendant Long observed that Mr. Lorquet's eyes were not bloodshot, his speech was not slurred, that he followed instructions even when unclear, that his balance was "sure," and that he was able to do all tasks attendant to driving and interacting without any signs of intoxication.

185.    In the midst of the arrest and jailing of Mr. Lorquet, Defendant Botts *also* observed that Mr. Lorquet's eyes were not bloodshot, his speech was not slurred, that he followed instructions even when unclear, that his balance was "sure," and that he was able to do all tasks attendant to driving and interacting without any signs of intoxication.

23

186. Despite making these observations, Defendant Botts's and Defendant Long's reports contain multiple blatant lies that are contradicted by BWC video.

187. In addition to making false statements in their reports and affidavits, both Defendants deliberately omitted nearly every single exculpatory fact and observation about Mr. Lorquet from their reports.

188. Defendants Botts and Long reported false information while knowing that Mr. Lorquet was not under the influence of any substance, with reckless disregard for Mr. Lorquet's rights and with reckless disregard for the truth.

189. Defendants Botts and Long caused Mr. Lorquet's malicious prosecution and continued confinement when they falsely reported that Mr. Lorquet was under the influence of some unarticulated and unknown (to this day) "drug."

190. Defendants Botts and Long caused the criminal prosecution against Mr. Lorquet by falsifying facts in their affidavits, reports, and various sworn testimony in an effort to make it appear that there had been probable cause for Mr. Lorquet's arrest when there was not, and providing those documents to the judge and District Attorney.

191. Defendants Botts' and Long's lies and omissions in their reports and affidavits were the sole moving force behind the criminal prosecution against Mr. Lorquet.

192. With knowing, intentional, and reckless disregard for the truth, Defendants Long and Botts included false statements of material fact in their reports and omitted material information from their reports that would have vitiated probable cause (namely, the absence of any indicia of impairment).

193. Defendants Long's and Botts's actions were done with malice.

194. No probable cause supported the criminal charges Botts and Long brought against Mr. Lorquet.

195. The criminal prosecution against Mr. Lorquet resolved in his favor when the Denver County Court dismissed his criminal case.

196. Defendants Long's and Botts's malicious and false prosecution of Mr. Lorquet caused him to suffer further trauma, damages, lost wages, suffering, depression, and despair in the various manners already described herein.

197. Such actions by Defendants Long and Botts deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and the Colorado Constitution, including the right to be free from malicious prosecution. These deprivations caused Mr. Lorquet to suffer lost liberty, an unjustified prosecution, reputational injuries, economic loss, and the damages that flowed therefrom.

**SEVENTH CLAIM FOR RELIEF**
**42. U.S.C. § 1983, Fourteenth Amendment**
***Equal Protection***
***(Against All Defendants)***

198. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

199. Mr. Lorquet is a Black Haitian American.

200. Immediately upon contacting Mr. Lorquet and communicating with him, Defendants knew that he was Black.

201. Despite speaking logically without slurring, stumbling over his words, or any difficulty at all with his speech, Defendants Long and Botts labeled it "thick-tongued" and "thick and distinct" (respectively) speech associated with drug/alcohol impairment, solely in reliance and as a result of their own discriminatory racial stereotypes regarding how persons of color (Black Americans in particular) speak, and having nothing to do with any actual drug/alcohol impairment indicia.

202. Defendant Long spent over 30 minutes with Plaintiff. He observed Plaintiff speak clearly, normally, and without any indication of impairment.

203. Defendant Botts sat in the hospital room listening to Plaintiff interact with the nurse asking him questions and asking him questions about various items himself for more than 15 minutes. He also observed Plaintiff's speech to be clear, normal, and without any indication of impairment.

204. Despite this, Defendant Botts and Defendant Long both decided they would work together to wrongfully arrest and maliciously prosecute Plaintiff for DUI by leaning heavily into their own racial stereotypes regarding how "white" people speak versus how minorities, Blacks, and people of color speak, and by falsely claiming as indicative of impairment Plaintiff's speech as "thick-tongued" (Long) and "thick and distinct" (Botts) despite no actual evidence of the same.

205. Neither Defendant Long nor Defendant Botts smelled or observed any evidence of drugs or alcohol or obtained any information suggesting that Mr. Lorquet used any drugs or alcohol that evening.

206. Defendant Officers utilized a racist, discriminatory, and factually incorrect way to describe Mr. Lorquet's speech and then attempted to have him criminally prosecuted him for it.

207. Defendants' decision to treat Mr. Lorquet differently (e.g., by using baseless accusations, holding his physical attributes against him, refusing to read him his *Miranda* rights, and arresting him without probable cause) was motivated by Plaintiff's race and/or national origin.

208. If Mr. Lorquet was white, he would not have been subjected to an extended wrongful detention for roadside tests, forced to comply with a blood draw, nor arrested/criminally prosecuted for a DUI crime he did not commit by Defendants.

209. Such actions by Defendants Long and Botts, while acting under the color of law, deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including the right to equal protection under the law. These deprivations caused Mr. Lorquet to suffer lost liberty, an unjustified prosecution, physical injuries, reputational injuries, economic loss, and dignitary injuries.

## VI.  PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law and equity, including but not limited to:

a. Declaratory relief and injunctive relief, as appropriate;

b. Actual economic damages as established at trial;

c. Compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, trauma, fear, anxiety, loss of enjoyment of life, loss of liberty, loss of sense of security, and other non-pecuniary losses;

d. Punitive or exemplary damages for all claims as allowed by law in an amount to be determined at trial;

e. Issuance of an Order mandating appropriate equitable relief, including but not limited to:

   i. Issuance of a formal written apology from each Defendant to Plaintiff;

   ii. The imposition of appropriate policy changes designed to avoid future similar misconduct by Defendants;

   iii. Mandatory training designed to avoid and prevent future similar misconduct by Defendants;

f. Pre-judgment and post-judgment interest at the highest lawful rate;

g. Attorney's fees and costs; and

h. Such further relief as justice requires.

## VII. JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted this 13th day of October, 2025, by:

THE LIFE & LIBERTY LAW OFFICE

*s/ Sarah Schielke*
Sarah Schielke, #42077

*Counsel for Plaintiff*
1055 Cleveland Ave
Loveland, CO 80537
P: (970) 493-1980
F: (970) 797-4008
E: sarah@lifeandlibertylaw.com